**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TOSIN BALOGUN, on behalf of herself and all others similarly situated, | |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| WUNDERKIND CORPORATION, | Case No. 25-cv-6113 |
| Defendant. | |

Plaintiff Tosin Balogun, on behalf of herself and all others similarly situated, bring this class action suit for damages and equitable relief against Defendant Wunderkind Corporation ("Wunderkind"). Plaintiff alleges the following based upon personal information as to allegations regarding herself, and the investigation of her counsel, and on information and belief as to all other allegations:

# TABLE OF CONTENTS

NATURE OF THE ACTION ......................................................................... 1

THE PARTIES ............................................................................................. 3

JURISDICTION AND VENUE ................................................................... 5

FACTUAL ALLEGATIONS ........................................................................ 6

    A.    Defendant Has Long Tracked and Profiled Individuals Online Using Sophisticated Behavioral Surveillance Tools ........................................... 6

    B.    Defendant Is an Identity Resolution Provider That Re-Identifies Real People Across Sites and Sessions ........................................................... 10

    C.    Defendant Tracks Users by Deploying Sophisticated Tracking Technologies and Aggregating Behavioral Data ................................... 15

    D.    Defendant Sells Access to Its "Identity Graph," Enabling Further Data Extraction ................................................................................................ 19

    E.    Plaintiff and Class Members Have a Reasonable Expectation of Privacy ..................................................................................................... 25

    F.    Plaintiff and Class Members Have Never Consented and Cannot Consent to Wunderkind's Intrusion ....................................................... 27

CLASS ACTION ALLEGATIONS ............................................................ 31

FIRST CAUSE OF ACTION ..................................................................... 36

SECOND CAUSE OF ACTION ................................................................ 38

THIRD CAUSE OF ACTION .................................................................... 39

FOURTH CAUSE OF ACTION ................................................................ 41

FIFTH CAUSE OF ACTION...................................................................... 43

SIXTH CAUSE OF ACTION ..................................................................... 45

PRAYER FOR RELIEF ............................................................................. 46

## NATURE OF THE ACTION

1.     Wunderkind operates a sprawling surveillance enterprise, tracking individuals across the internet and linking their behaviors, devices, and identities into enduring profiles. This tracking occurs without consent; users do not opt in. And in most cases it happens silently; users do not even know they are being tracked.

2.     The mechanism of this surveillance is Wunderkind's proprietary code, deployed across "thousands" of consumer-facing websites operated by its business clients ("Clients"). As users browse, Wunderkind captures behavioral signals like mouse movements, page views, scroll patterns, and purchase activity, combining them with identifiers such as email addresses and phone numbers.

3.     Wunderkind then undertakes its own version of a common type of data process known as identity resolution, thereby reconciling fragments of a user's identity into a unified user profile. Wunderkind's user profiles are both rich and resilient. They enable the company to recognize a user across sessions, devices, browsers, and brand domains.

4.     At the core of this system is the "PrivacyID" data point. PrivacyID is a unique identifier assigned to each individual based on signals like IP address, browser version, and device type. Unlike cookies, the PrivacyID does not expire or reset when the user switches devices or clears their browser. It is engineered to persist as the collection point for a given user's data from across the internet.

5.     Attached to each PrivacyID is a continuously expanding dossier. Its records can include browsing patterns, device metadata, transaction history, IP logs, inferred interests, and real-world identifiers such as names, emails, and phone

numbers. These profiles are built with data from both real-time surveillance and bulk data transfers.

6.     Wunderkind uses these profiles to target people with personalized ads and messages across websites, emails, and devices. It segments users into behavioral cohorts, triggers real-time onsite prompts, synchronizes cross-channel messaging, and delivers targeted emails referencing prior activity, even when the user never logged in or entered an email on the site in question. In effect, the profile becomes a central node in a marketing infrastructure designed to observe, model, and influence individual behavior at scale.

7.     The scale of this data collection is staggering. Wunderkind touts that its "Identity Graph" spans 9 billion devices, 1 billion consumers, and 2 trillion digital transactions per year. Wunderkind has long declared its need to collect "as much data as possible" in order to build rich, user-specific profiles and that "the sheer volume of consumer data available to Wunderkind clients is immense[.]"

8.     Absent certain context, website visitors expect their actions on, and communications with, a website to stay between them and that website. Consumers reasonably expect to preserve their anonymity when visiting a website without making an account, logging in, entering their name, or accepting marketing cookies.

9.     Wunderkind defeats those expectations at every level. It identifies users who have cleared cookies, activated private browsing, or used VPNs. It builds and maintains behavioral dossiers tied to real-world identities, rarely with users' knowledge and never with their informed consent.

10.    Plaintiff seeks monetary and injunctive relief on behalf of herself and all others similarly situated against Defendant for violating common law prohibitions on unjust enrichment and intrusion upon seclusion, the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 et seq., the New York General Business Law ("GBL") § 349; the right to privacy under Article I, Section 1 of the California Constitution; and the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631(a).

## THE PARTIES

11.    Plaintiff Tosin Balogun is a resident of California. She uses the internet in the regular course of life and has held accounts with, and has in the past year, visited the websites of numerous Wunderkind Clients, including but not limited to Macy's, Fashion Nova, Vogue, Shutterfly, Hertz, Tarte, HelloFresh, Belk, and Vista Print.

12.    She has signed up for newsletters or promotions with, and has in the past year visited the websites of, various other Wunderkind Clients.

13.    Plaintiff has also, in the past year, visited the websites of many other Clients without logging in, creating an account, or otherwise identifying herself. Plaintiff visits these websites regularly.

14.    At no point was Plaintiff made aware that her visits to certain websites would result in her identity being tracked, aggregated, or monetized by Wunderkind, a third party she had no relationship with.

15.    Plaintiff is privacy conscious and has taken multiple steps to preserve her online privacy, including clearing cookies, using private browsing modes, opting

out of tracking when given the option, and submitting data deletion or access requests under the CCPA. She has also attempted to limit unwanted marketing by unsubscribing from email lists but continued to receive communications, reinforcing her concern that her personal information was being shared or retained beyond her control.

16.     Plaintiff has occasionally provided companies with her personal information, such as an email address or phone number, for narrow and specific purposes such as signing up for online accounts or receiving order confirmations, newsletters, or discount codes. Plaintiff did not, however, authorize those companies to share that information with Wunderkind or permit its use for cross-brand identity tracking.

17.     Plaintiff reasonably believed that when she visited a website without logging in, entering personal information, or accepting cookies, she was doing so anonymously. She was not aware that a third party embedded on those sites could recognize, track, and profile her identity across brands, devices, and sessions.

18.     Plaintiff has not received any notice, benefit, or compensation in exchange for the data collected and monetized by Wunderkind. She finds the invasion of Wunderkind's surveillance—that elements of her personal identity and behavioral patterns are being tracked, collected, and used to drive commercial outcomes, without her knowledge or consent—alarming and highly offensive.

19.    Defendant Wunderkind Corporation is a Delaware corporation with its principal place of business at 285 Fulton Street, One World Trade Center, 74th Floor, New York, New York 10007.

20.    Defendant states that it contracts with approximately 1000 Clients. Its Clients have included operators of high-traffic websites such as Weather.com (weather.com), CNN (cnn.com), AP News (apnews.com), Xfinity (xfinity.com), CNBC (cnbc.com), Macy's (macys.com), NBA (nba.com), Publisher's Clearing House (pch.com), Fashion Nova (fashionnova.com), The Kitchn (thekitchn.com), Petco (petco.com), Thesaurus.com (thesaurus.com), Horoscope (horoscope.com), and GNC (gnc.com). Weather.com and CNN alone accounted for over 1 billion web visits in the United States in June 2025.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 &1332(a)(1).

22.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 class members are involved; and many members of the proposed Classes are citizens of different states than the Defendant.

23.    This Court has personal jurisdiction over Defendant because its principal place of business is in New York, it committed the tortious acts alleged herein in New York, regularly conducts business in this District, and has extensive contacts with this forum.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

25.    This Court has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

**A.    Defendant Has Long Tracked and Profiled Individuals Online Using Sophisticated Behavioral Surveillance Tools**

26.    For more than a decade, Defendant has systematically tracked individuals online. Its business model centers on identifying website visitors, monitoring their behavior in real time, and compiling behavioral data into persistent user profiles. These profiles are tied to over one billion consumers and contain PII, behavioral patterns, and device-level identifiers.

27.    Defendant launched in 2010 under the name Bounce Exchange. Its initial product, "Exit Intent," was designed to detect when users were likely to leave a website by tracking cursor movements and other micro-interactions.[1] At the time, the company marketed the tool as one that monitored "all the cursor movements of every visitor in real-time" and displayed a marketing overlay "the precise millisecond that a visitor abandons your site."[2]

---

[1] https://web.archive.org/web/20120412015220/http://bounceexchange.com:80/ (last accessed July 24, 2025)

[2] https://web.archive.org/web/20130302001614/http://bounceexchange.com/#what_we_do (last accessed July 24, 2025)

28.     A patent filed by Defendant confirms that one purpose of this software is to initiate marketing prompts "upon detection of an intent to leave the webpage."[3] Defendant illustrates:



29.     In simple terms, the software tracks user behavior until it determines that the user is preparing to leave. At that point, it intervenes with a marketing message.

30.     From its inception, Defendant's focus has been on capturing what it terms "digital body language,"[4] otherwise known as "behavioral marketing," which

[3] https://patentimages.storage.googleapis.com/fe/24/ed/d086547ac5edd4/US8645212.pdf (last accessed July 24, 2025)

[4] https://www.forbes.com/sites/julianmitchell/2017/01/18/bouncex-the-behavioral-marketing-leader-reshaping-how-brands-target-consumers/ (last accessed July 24, 2025)

its co-founder has claimed the company pioneered.[5] This captures information like mouse activity, scrolling, and navigation behavior, to infer user intent and intervene with targeted messaging. Its early tools emphasized real-time surveillance of users on individual websites.

31.    By 2013, Defendant had incorporated the collection of personally identifiable information into its strategy. It promoted email addresses as a "phenomenal profit driver" for Clients and described its technology as converting anonymous web traffic into known leads through behavioral data and identifiers.[6]

32.    In public statements, Defendant stated that it needs to collect "as much data as possible" to build user-specific profiles and deliver personalized marketing.[7] This strategy evolved to enable recognition of users across sessions, browsers, and devices.

33.    In 2017, Defendant stated that it could identify behavioral patterns in real time, detect when a user was likely to provide identity information, and then associate that activity with a persistent profile that would follow the individual across future interactions with a brand, regardless of platform or device.[8]

---

[5] https://www.prnewswire.com/news-releases/bouncex-hits-100-million-annual-revenue-and-unveils-new-name-wunderkind-301011307.html (last accessed July 24, 2025)

[6] https://web.archive.org/web/20130918193601/http://bounceexchange.com/ (last accessed July 24, 2025)

[7] https://atdata.com/blog/client-spotlight-bounce-exchange-shares-why-behavioral-marketing-is-crucial/ (last accessed July 24, 2025)

[8] https://www.forbes.com/sites/julianmitchell/2017/01/18/bouncex-the-behavioral-marketing-leader-reshaping-how-brands-target-consumers/ (last accessed July 24, 2025)

34.    Rebranding as Wunderkind in 2020, Defendant positioned its technology as immune to the decline of the third-party cookie, touting its abilities to track users by other means.[9]

35.    In 2024, Wunderkind unveiled its "Unified Identity Graph," a proprietary system designed to merge disparate data points including emails, phone numbers, device IDs, browsing activity, shopping behavior, and third-party identifiers into a single profile.[10] According to a company executive, the graph enables Wunderkind to track consumers across most websites a consumer has visited, facilitated by integrations on thousands of websites.[11]

36.    The scope of this data collection is staggering. Wunderkind boasts that its Identity Graph includes "**9 billion devices**, **1 billion consumers** and observes **2 trillion digital transactions per year**[.]" (emphasis added.)[12]

37.    Wunderkind markets its data operation as a competitive advantage. The company boasts of "over a decade of data-driven consumer insights,"[13] claiming that

---

[9] https://medium.com/wunderkind/what-googles-cookie-announcement-means-for-digital-marketers-7f65d5148ea7 (last accessed July 24, 2025)

[10] https://www.businesswire.com/news/home/20240925445673/en/Wunderkind-Unveils-Identity-Solution-Enhancements-To-Amplify-Customer-Revenue-and-Experiences (last accessed July 24, 2025)

[11] https://loyalty360.org/content-gallery/daily-news/loyalty-live-wunderkind-on-leveraging-ai-and-helping-brands-elevate-marketing-messages-with-hyper-p (last accessed July 24, 2025)

[12] *The Power of Acquisition*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

[13] https://www.wunderkind.co/platform/ (last accessed July 24, 2025)

- 9 -

"the sheer volume of consumer data available to Wunderkind clients is immense[.]"[14]

As Wunderkind puts it: "Data is the difference."[15]

**B.    Defendant Is an Identity Resolution Provider That Re-Identifies Real People Across Sites and Sessions**

38.    Wunderkind operates an identity resolution enterprise.

39.    Identity resolution refers to the process of linking disparate data points, such as IP addresses, device fingerprints, session histories, and browsing behavior, to a single, identifiable individual.

40.    Wunderkind's core identity resolution product is the "PrivacyID." Each user is assigned a unique PrivacyID, a pseudonymous but stable identifier that persists across sessions, devices, and websites. According to Wunderkind, this identifier is "created using a variety of data signals, such as IP addresses, browser versions, and device types."[16] It does not change when a user clears cookies, switches sites, or moves between devices.

41.    Behind the PrivacyID sits a continuously updated behavioral profile, which includes shopping and browsing activity, device data, IP history, inferred interests, and real-world identifiers like name, email address, and phone number.

---

[14] *Demystifying the Value of Identity in Performance Marketing*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

[15] *Id.*

[16] https://www.wunderkind.co/blog/article/cross-site-and-cross-device-identification/ (last accessed July 24, 2025)

42.    To create the PrivacyID for "1 billion consumer profiles,"[17] Wunderkind uses identity resolution technology to track individuals across the internet by collecting and linking these data points across websites, devices, and sessions. These signals are used to construct persistent profiles that map back to real-world identities.

43.    Identity resolution enables companies to recognize users even when they have not logged in, effectively removing the cloak of anonymity by inferring identity through indirect signals. As Defendant explains in its own marketing:

> Eventually though, you may reach a point where as hard as you try, visitors to your website remain anonymous – and therefore unable to be reached with your messaging. This is where you'd turn to an identity resolution partner to help you identify that traffic, or turn your unknown visitors into known individuals.[18]

44.    Wunderkind relies on two complementary methods to perform identity resolution: deterministic and probabilistic matching.

45.    Deterministic matching begins when a user directly provides identifying information, such as by entering an email address, phone number, or other credential into a form field. When that information is submitted, Wunderkind matches it with existing profile data or creates a new identifier tied to the individual. This method allows for precise recognition, as the identity is confirmed through a unique and definitive signal (such as an email address). Deterministic matching is typically

---

[17] https://www.businesswire.com/news/home/20240925445673/en/Wunderkind-Unveils-Identity-Solution-Enhancements-To-Amplify-Customer-Revenue-and-Experiences (last accessed July 24, 2025)

[18] *Id.*

triggered during login, newsletter sign-ups, purchases, or checkout flows, and provides the foundational link that anchors behavioral data to a specific individual.

46.    Wunderkind also uses probabilistic matching, an inference-based technique that aggregates signals such as device characteristics, IP address patterns, and behavioral indicators (e.g., scrolling, clicking, and navigation patterns) to approximate the user's identity. Probabilistic identity resolution is designed to identify users even on unauthenticated pages (i.e., those which a user need not log in to access) or in the absence of a direct identifier, allowing Wunderkind to track individuals across websites and devices without disclosure or consent.

47.    Probabilistic matching plays a central role in enabling re-identification at scale. Even when users take steps to avoid being tracked by clearing cookies, enabling private browsing modes, or using VPNs, Wunderkind correlates behavioral patterns and technical signals to assign a stable identity.[19] These matches are used to maintain consistent profiles over time, which can then be linked back to known identities with a single data point. The end result is that consumers who believe they are anonymous online are, in fact, persistently recognized and profiled.

48.    Wunderkind also receives "customer emails [*sic*] lists and other PII" from its clients and then converts those into hashed pseudonymous identifiers.[20]

49.    While Defendant labels the data it captures as "pseudonymous," PrivacyID's structure and implementation render that label effectively meaningless.

---

[19] *Unpacking the Power of Identity Resolution in Travel*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

[20] https://www.wunderkind.co/privacy/ (last accessed July 24, 2025)

Pseudonymity implies a separation between an identifier and the individual it represents. In Wunderkind's system, however, that separation is superficial. The identifier is deliberately engineered to preserve continuity across sessions and devices, and it remains fully linkable to a known person through any definitive data point, such as an email address entered once, or a previously observed device signature. As a result, the PrivacyID functions as a persistent alias for a real-world identity tied to a detailed behavioral profile.

50.    Defendant openly acknowledges that its identity resolution technology circumvents common privacy controls. As one company presentation explains, Defendant's identity resolution technologies will reidentify visitors who have deleted cookies, enabled private-browsing modes, logged out of their accounts, activated VPNs, or run ad- and script-blockers, all of which are steps taken by consumers expressly to avoid tracking.[21]

---

[21] *Unpacking the Power of Identity Resolution in Travel*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

## Why You Would Need Identity Resolution

For travel brands, identity resolution significantly improves the ability to recognize a returning traveler, whether it's a previous customer or someone on your marketing list who currently appears as anonymous when visiting your website.

Several technical factors can cause a returning visitor to seem anonymous. Here's a quick look at a few:

**First-Party Cookies Can Expire**
Cookies used to track visitors (such as session or identification cookies) may have expiration dates. If the cookie has expired, the visitor will no longer be recognized.

**Visitor Deleted Cookies or Used Private Browsing**
If the visitor clears their browser cookies or is using a browser in incognito/private mode, they may appear as a new or anonymous visitor.

**Using a Different Device or Browser**
If the visitor is accessing the website from a different device (e.g., switching from desktop to mobile) or using a different browser that was not previously identified by the brand, they may appear as anonymous.

**Logged Out of Their Account**
If a travel brand uses a log-in feature, but the visitor is no longer logged in on their return visit, the website won't be able to tie their session to their user account, treating them as anonymous.

**IP Address Changes**
Dynamic IP addresses that change frequently (e.g., through the use of VPNs, mobile networks, or simply dynamic IPs from the internet service provider) may cause the website to fail to recognize the user.

**Use of Ad Blockers or Script Blockers**
Some ad blockers or privacy extensions can block cookies, tracking scripts, or fingerprinting technologies, preventing websites from identifying returning visitors.

**Cross-Domain Tracking Issues**
If the visitor moves between different domains owned by the same company, cross-domain tracking might not be properly set up, which would cause the system to fail to recognize the visitor across these domains.

**Changes in Browser Settings or Updates**
Changes in browser settings, such as increased privacy measures (e.g., changes in Safari's Intelligent Tracking Prevention or Firefox's Enhanced Tracking Protection), may restrict the ability to track visitors between sessions.

51.     Rather than respecting those choices, Defendant employs both deterministic and probabilistic matching to reestablish persistent identity.

52.     From the moment a user visits any website in Wunderkind's network, their behavior is logged and associated with a PrivacyID. That identifier attaches to their actions across the internet, even without login or consent. The result is a continuously expanding, cross-site profile maintained without the user's knowledge, and leveraged by Wunderkind to power targeted advertising and client campaigns.

53.     These practices leave no room for meaningful anonymity online. They ensure that users cannot avoid tracking even when they take affirmative steps to do so. In effect, Wunderkind has designed a surveillance system that functions regardless of user intent, privacy settings, or technical safeguards.

**C.    Defendant Tracks Users by Deploying Sophisticated Tracking Technologies and Aggregating Behavioral Data**

54.    When a user visits a Client's website, Wunderkind activates a suite of surveillance tools engineered to identify individuals and log their behavior in granular detail.

55.    Chief among these tools are two proprietary tracking systems: the "SmartTag" and the "Conversion Pixel" (collectively, the "Tracking Technologies"). These are core instruments of Wunderkind's data capture. As Defendant openly states, these tools are designed "to enhance known customer profiles and identify a significant amount of your anonymized website traffic."[22]

56.    The SmartTag is a JavaScript-based script embedded across every page of a Client's website, including sensitive areas such as checkout and order confirmation pages.[23] From the moment the page loads, the SmartTag begins observing user behavior in real time.

57.    Once deployed, the SmartTag assigns a persistent identifier to each user and continues monitoring that individual over time and across visits. Whether or not the visitor ever creates an account or logs in, their activity is continuously tracked. The data is then transmitted to Wunderkind's servers and, in many cases, to third-party advertisers and advertising networks.

---

[22] https://www.wunderskind.com/how-it-works/performance-marketing-solutions-for-ecommerce/ (last accessed July 24, 2025)

[23] https://support.wunderkind.co/hc/en-us/articles/24664130565659-SmartTag-Overview-Browser-Support (last accessed July 24, 2025)

58.    Wunderkind has refined this technology over the course of more than a decade, beginning at least as early as 2013.[24]

59.    The Conversion Pixel is deployed on a website's order confirmation page and serves a distinct but related purpose: to link transaction-level data with Wunderkind's identity resolution infrastructure.[25]

60.    The Pixel includes both a JavaScript snippet and a one-pixel image beacon. Upon a completed purchase, the Pixel collects and transmits a range of post-transaction data points, including email addresses, phone numbers (in plain text or hashed form), order totals, product SKUs, coupon codes, payment methods, and currency types, directly to Wunderkind.[26]

61.    To use the Pixel for "identification purposes," email addresses and phone numbers "must be passed as plain text."[27] And even when identifiers like emails or phone numbers are hashed, Wunderkind retains the means to reverse-engineer or match them against its existing databases, enabling the retroactive construction or enhancement of known user profiles.

62.    The Conversion Pixel thus facilitates Wunderkind's ability to (1) attribute individual sales to prior user interactions across digital channels (e.g., email

---

[24] https://web.archive.org/web/20130302001614/http://www.bounceexchange.com/#what_we_do (last accessed July 24, 2025)

[25] https://support.wunderkind.co/hc/en-us/articles/24664114189339-Conversion-Pixel-Overview (last accessed July 24, 2025)

[26] *Id.*

[27] *Id.*

opens, site visits), (2) build or enhance individual user profiles, and (3) inform future behavioral targeting and personalized marketing efforts on behalf of the Clients.

63.    When a user has not yet supplied their identity, Wunderkind initiates what it describes as "identity capture," a programmatic campaign that actively seeks to elicit personal identifiers based on behavioral cues or user characteristics.

64.    In these anonymous sessions, where a user has not yet been matched to a profile, the system closely monitors certain predefined behaviors to infer intent or vulnerability.[28] These behavioral "signals" include:

- Scrolling a defined portion of the page;

- Highlighting text;

- Hovering over elements;

- Viewing multiple pages;

- Pausing while typing;

- Remaining on a page for a set duration;

- Scrolling past a target element;

- Clicking a link or button;

- Moving the mouse toward the browser close button (exit intent);

- Ceasing activity for a set time;

- Resuming activity thereafter;

- Pressing the back button.

---

[28] *The Power of Acquisition*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

65.   To enable its clients to market with surgical precision, Defendant further groups visitors into "highly-targeted segments" by harvesting a wide range of contextual and behavioral attributes.[29] The Tracking Technologies capture each visitor's geographic location, browser type, device resolution and orientation, date and time of visit, and device model. Defendant also records on-site behavior, such as the specific pages viewed, the order and number of pages visited, and the referring third-party website or platform, and uses these data points to assign visitors to dynamic cohorts tailored for personalized outreach.

66.   Defendant's Privacy Policy confirms the use of such Tracking Technologies, stating:

> Our Platforms and our Services may utilize tracking technologies such as pixel tags, HTML5 cookies, HTTP cookies, web beacons, statistical identifiers, and mobile o/s advertising identifiers such as Apple's IDFA, the Android Advertising ID and other pseudonymous information.[30]

67.   Beyond real-time tracking, Wunderkind supplements its user profiles through asynchronous data exchanges with Clients. Clients supply full data files, including loyalty status, past transactions, and customer profile attributes. This offline data is merged with online behavioral traces to form a unified profile of each individual, encompassing not just their browsing history, but also their broader commercial identity.

---

[29] *Id.*

[30] https://www.wunderkind.co/privacy/ (last accessed July 24, 2025)

**D.    Defendant Sells Access to Its "Identity Graph," Enabling Further Data Extraction**

68.    Defendant has registered as data broker under California law, which defines a data broker as a "business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct relationship." Cal. Civ. Code § 1798.99.80(c). Defendant squarely fits this definition. It traffics in the identities of individuals who are unaware of its existence, let alone its data practices.

69.    The consumer profiles tied to PrivacyIDs are stored in Wunderkind's Identity Graph, its perpetually updated database that links pseudonymous identifiers to real-world individuals. According to Wunderkind, the Identity Graph includes "billions of contacts loaded with rich profile data," including names, email addresses, phone numbers, device identifiers, and shopping behavior.[31] These profiles reflect cumulative online activity spanning years.

70.    Wunderkind contracts with nearly 1,000 companies, enabling it to serve as a centralized identity exchange.[32] Through this networked infrastructure, Wunderkind pools data across brands to enable real-time recognition of individuals across sites and devices. The stated goal of this data-sharing architecture is to

---

[31] *Demystifying the Value of Identity in Performance Marketing*, downloaded from www.wunderkind.co (last accessed July 24, 2025); *see also* https://www.businesswire.com/news/home/20240925445673/en/Wunderkind-Unveils-Identity-Solution-Enhancements-To-Amplify-Customer-Revenue-and-Experiences (last accessed July 24, 2025)

[32] *The Power of Acquisition*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

increase identification rates, turning fragmented or otherwise anonymous user activity into an identified pieces of data. This system functions as a shared surveillance backend for Wunderkind's entire client base.

71.    Wunderkind is open about the role its client network plays in enabling identity resolution. It describes itself as the connective layer between user interactions on different digital properties. As one executive stated:

> Through our identity graph, we know most of the other sites the customer has visited. Maybe not all of them, but we're on thousands of websites.[33]

72.    In an interview, a senior executive explained that the company could recognize a device as belonging to a specific person with a defined set of traits and history ("Tim, right, from Denver, with 2.5 kids, etc. etc. and any of [his] browsing history")[34] but claims to withhold that granular identity from its clients. Instead, it uses that insight to make recommendations, cloaking the extent of identification behind a veneer of pseudonymity.

73.    But pseudonymity is not privacy. Wunderkind's marketing materials present two distinct but closely related use cases, each beginning with the reidentification of an unknown user and ending with personalized marketing. In both, Wunderkind emphasizes its ability to fill gaps in what its Clients know, relying

---

[33] https://loyalty360.org/content-gallery/daily-news/loyalty-live-wunderkind-on-leveraging-ai-and-helping-brands-elevate-marketing-messages-with-hyper-p (last accessed July 24, 2025)

[34] https://videos.wunderkind.co/public/129/Wunderkind-Webinars-707e800d/b4fd45b7 (last accessed July 24, 2025)

on its own cross-site behavioral and identity data to shape messaging while keeping the underlying identification concealed.

74.    In the first scenario, the Client does not yet have the user's email address or personal identifiers. A "Jane Doe" consumer arrives on the site, having no account with the company. Left to its own tools, the Client would not be able to identify or engage her in a meaningful way. But Wunderkind intervenes. Drawing on its trove of behavioral profiles linked across its Client ecosystem, Wunderkind "knows what Jane does when she's on multiple sites and cruising the web."[35] Using this insight, it generates a customized prompt designed to induce Jane to opt in to marketing. As Wunderkind puts it in a later video: "We can create a bespoke offer to get her to opt in to marketing before she's even a customer."[36] In other words, identity resolution is used not only to track Jane, but to create individualized insight into how best to manipulate her into providing her personal data, which the Client previously lacked.

75.    In the second scenario, the Client already has the user's email address but wants to deepen its engagement. Wunderkind gives the example of another "Jane" who has an account with a Client, but browses its site without logging in or otherwise identifying herself.[37] She adds items to her cart, then leaves. Despite

---

[35] https://videos.wunderkind.co/public/129/Wunderkind-Webinars-707e800d/85a44f79 (last accessed July 24, 2025)

[36] https://videos.wunderkind.co/public/129/Wunderkind-Webinars-707e800d/4d82e2d4 (last accessed July 24, 2025)

[37] *Demystifying the Value of Identity in Performance Marketing*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

providing no information during that session, she later receives a personalized marketing email referencing the exact items she abandoned. Wunderkind explains that this is possible because it already recognized her from previous visits to other partner sites. In this case, identity resolution enables persistent surveillance across sessions and brands, linking anonymous activity to known identity and powering precise, individualized follow-up messaging.

76.    Consumers reasonably assume they remain anonymous when they take no steps to identify themselves. Yet Wunderkind's system actively defeats this assumption by reconstructing identity through shared network intelligence. Even when a user does not enter a name or email address, their behavior and device traits act as proxies for identification.

77.    Defendant's Privacy Policy acknowledges that it shares pseudonymous identifiers "across Clients," allowing different companies to "more effectively recognize Users" and "leverage the data collected from their Digital Properties." The Privacy Policy states:

> While we don't operate a data marketplace, some of the transfers of data from the Platforms may be considered a sale of personal information under certain jurisdictions in the U.S. such as the state of California. For example, where we use the Identity Platform to create pseudonymous IDs to identify browsers and devices, we enable the use of those pseudonymous IDs across multiple Clients.[38]

78.    Wunderkind operationalizes its Identity Graph and associated PrivacyIDs to "to drive higher engagement from [Clients'] website visitors ('Users')

---

[38] https://www.wunderkind.co/privacy/ (last accessed July 24, 2025)

via [its] behavioral automation platform, identity platform, ad serving platform, and performance advertising platform."[39]

79.    The company describes its system as a "giant advertising platform technology,"[40] one that extracts value directly from the Identity Graph. Its marketing pitch is explicit:

> Wunderkind's identity enrichment strategy advances user identification, ensuring advertisers and publishers gain a competitive edge in today's privacy-focused market.[41]

80.    Wunderkind also leverages the PrivacyID to trigger direct marketing emails, serve on-site advertising, and deploy behavioral nudges across devices and channels. Its PrivacyID is "part of the engine that underpins [its] Autonomous Marketing Platform" and "plays a crucial role in how data drives personalized marketing strategies."[42] With continued enhancements, the "depth of user insight provided by PrivacyID will only expand, feeding into smarter, more adaptive campaigns that deliver real results."[43]

81.    On its Autonomous Marketing Platform page, Defendant boasts: "Equipped with over a decade of data-driven consumer insights and cutting-edge AI,

---

[39] https://www.wunderkind.co/privacy/ (last accessed July 24, 2025)

[40] https://loyalty360.org/content-gallery/daily-news/loyalty-live-wunderkind-on-leveraging-ai-and-helping-brands-elevate-marketing-messages-with-hyper-p (last accessed July 24, 2025)

[41] https://videos.wunderkind.co/public/129/Wunderkind-Webinars-707e800d/c5bb8f94 (last access July 24, 2025)

[42] https://www.wunderkind.co/blog/article/unifying-user-identity-introducing-wunderkind-privacyid/ (last accessed July 24, 2025)

[43] *Id.*

Wunderkind is well-positioned to empower marketers to grow their businesses at an unprecedented speed and scale, delivering meaningful revenue through efficiency while saving time and critical resources."[44]

82.    The company encourages Clients to synchronize advertising and marketing across all channels, asserting that "using all of them together is really where brands get ahead."[45] A Wunderkind Ads executive states:

> But what we want to do with KIND ads is actually get those users to the site in the first place, drive that large volume of qualified users to your page so that then our performance marketing engine can be powered. We want to feed those people in so that we can then identify them, then reach them over other channels as well.[46]

83.    Ads pull users in, tracking resolves who they are, and targeted follow-up extracts commercial value. Wunderkind reports that its system has driven over $5 billion in revenue for Clients.[47]

84.    Industry observers have taken notice. A 2023 TechCrunch article summarized the dynamic plainly:

> From a user perspective, Wunderkind's product sounds a bit . . . creepy, frankly. Indeed, the case against behavioral marketing is stacking up. But for many companies, the results are well worth the potential controversy.[48]

---

[44] https://www.wunderkind.co/platform/ (last accessed July 24, 2025)

[45] https://www.wunderkind.co/resources/podcasts/wunderkind-ads/ (last accessed July 24, 2025)

[46] *Id.*

[47] *Demystifying the Value of Identity in Performance Marketing*, downloaded from www.wunderkind.co (last accessed July 24, 2025)

[48] https://techcrunch.com/2023/03/02/behavioral-marketing-platform-wunderkind-nabs-76m/?guccounter=1 (last accessed July 24, 2025)

85.    Ultimately, the Identity Graph transforms pseudonymous data into actionable, commercial intelligence. Wunderkind's infrastructure turns invisible tracking into recognizable identity, trades in that identity across clients, and monetizes it without transparency, consent, or user awareness.

**E.    Plaintiff and Class Members Have a Reasonable Expectation of Privacy**

86.    Government agencies, lawmakers, and privacy advocates have become increasingly concerned with the activities of data brokers such as Wunderkind, as internet users, including Plaintiff and Class Members, have a reasonable expectation that information related to their browsing and website activities, including information as granular as how long they hovered over a button, is and remains private.

87.    Consumers today have essentially no choice but to engage in the online marketplace. When a Macy's customer goes to Macys.com, they do not expect that a shadowy, third-party data broker is mapping how their cursor moves around a webpage and then combining these data with thousands of other pieces of information collected over numerous sessions to build out a detailed picture of that individual's life. Engagement with Macys.com does not and should not be taken as permission to expose or create a picture of a user's online persona, so central to modern life, to advertisers and other outside actors. If such granular information cannot be expected to remain private, any reasonable expectation of privacy on the internet is destroyed. And if no expectation of privacy exists on the Internet, privacy everywhere would be severely eroded.

88.    Data aggregators such as Wunderkind have trampled all over these expectations in pursuit of constant surveillance over users' online activities and tastes. They have been described as "Big Brother-in-Law" because of their ability "to form an ever-evolving, 360-degree view of U.S. residents' lives." [49] Further, the Federal Trade Commission has published a warning about the hidden data broker ecosystem, in which "companies have a profit motive to share data at an unprecedented scale and granularity," including a "staggering" amount of "highly personal information that people choose not to disclose even to family, friends, or colleagues."[50]

89.    On the regulatory side, lawmakers such as Senator Ron Wyden have noted "[d]ata brokers are serving as shady middlemen to sell [consumers'] personal information without any legal protections" and that "[s]elling personal information that people provide to sign up for power, water and other necessities of life, and giving them no choice in the matter, is an egregious abuse of consumers' privacy."[51]

90.    Privacy advocates and academics have expressed concerns about how technologies such as Wunderkind store data far beyond traditional cookies, introducing another dimension of privacy violation. The use of "first party"

---

[49] https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-deportation.html (last accessed July 24, 2025)

[50] https://www.presidency.ucsb.edu/documents/white-house-press-release-location-health-and-other-sensitive-information-ftc-committed (last accessed July 24, 2025)

[51] https://www.wyden.senate.gov/news/press-releases/wyden-urges-cfpb-to-protect-americans-privacy-and-stop-the-sale-of-personal-data-by-credit-agencies (last accessed July 24, 2025)

information and other non-traditional cookies by brokers like Wunderkind "create[s]" persistent, identifiable connections to people across activity on multiple devices" that, according to privacy advocates, are "even more robust of an identifier than your actual name or other [forms of PII]."[52]

91. In addition, information gleaned from tracking technologies that don't rely on cookies "can be used to build persistent profiles."[53] Thus, activities on or information inputted into a webpage, which users reasonably expect to be lost to the sands of time, is preserved for far longer than normal and combined with other information to build an exploitable profile of a user.

## F. Plaintiff and Class Members Have Never Consented and Cannot Consent to Wunderkind's Intrusion

92. Consent requires knowledge. It demands choice. Plaintiff and Class Members had neither. They never agreed to Wunderkind's surveillance because they were never given the opportunity to do so. Consent cannot be inferred from silence, nor can it be manufactured through deceptive practices that obscure the reality of constant tracking.

93. A person does not agree to be surveilled simply by existing in the digital world. Plaintiff and Class Members, like all modern consumers, are effectively compelled to live much of their lives online. But presence in that world does not signal

---

[52] https://digiday.com/media/after-winning-the-battle-over-third-party-cookie-tracking-will-privacy-advocates-lose-the-personal-data-use-war/ (last accessed July 24, 2025)

[53] https://indulge.digital/blog/browser-fingerprinting-google%E2%80%99s-latest-move-privacy-war (last accessed July 24, 2025)

permission to be tracked, profiled, and exploited. Ubiquity is not license. Convenience is not consent. And the technological ability to surveil does not confer a legal right to do so. A visitor to a website is no more consenting to invasive tracking than a pedestrian walking down the street is consenting to be followed and profiled by a private investigator. The fact that tracking occurs does not mean it has been authorized.

94.    Further, Wunderkind operates a complex and wide-reaching data collection and processing machine that relies on a number of different tools and methods to conduct extensive collection, tracking, and monitoring of users' internet activities, obscuring the true extent of its privacy violations to ordinary consumers. There is no reasonable way for everyday Americans to truly grasp how deeply the tentacles of data brokers such as Wunderkind reach into their online profiles and activities.

95.    The Findings and Declarations of the California Privacy Rights Act (CPRA) notes that the "asymmetry of information" inherent in the "collect[ion] and use [of] consumers' personal information . . . makes it difficult for consumers to understand what they are exchanging and therefore to negotiate effectively with businesses."[54] There is asymmetry of knowledge between Wunderkind and the data subjects it exploits, including Plaintiff and the members of the Class, in that Wunderkind has an complete knowledge of its data collection and data exploitation

---

[54] https://www.caprivacy.org/cpra-text-with-ccpa-changes/ (last accessed July 24, 2025)

practices, but Plaintiff and Class members have no direct relationship with Wunderkind regarding these practices and no reasonable basis to discern those practices nor the nature of the practices directed at them.

96.    A user's account with a client does not permit Wunderkind to track across the website and compile a detailed dossier. Plaintiff and Class members cannot reasonably foresee all the ways in which Wunderkind may use the detailed dossiers it is compiling on them. Plaintiff and Class members have no way of knowing the specific third parties to which Wunderkind will provide their personal information, or what those third parties will do with that information. Plaintiff and Class members thus cannot provide knowing and informed consent to Wunderkind's dissemination of their personal information. At no point during its tracking, collection, or processing of users' personal data, does Wunderkind ever directly ask individuals for their consent.

97.    Moreover, Plaintiff and Class members have not implicitly, indirectly, or manifestly consented to Wunderkind's activities. Wunderkind's "privacy policies" are not directed to the activities it takes related to Plaintiff and Class members, all of whom are not directly related to Wunderkind and have no reasonably comprehensive set of information about Wunderkind's data collection and exploitation practices or how they may or may not be subject to such practices. Therefore, there is no reasonable basis for Plaintiff and Class members to be aware of Wunderkind's privacy policies or have directed themselves to them or have understood them to be applicable to themselves. Plaintiff and Class members are

therefore not legally subject to or governed by Wunderkind's published privacy policies.

98.    In any event, these policies are insufficient to properly or adequately disclose the nature and extent of Wunderkind's data collection and exploitation practices to Plaintiff and Class members. All day, every day, Plaintiff and Class members are confronted by thousands of pages of "terms and conditions" and "privacy policies" for products and services on the Internet.

99.    Computer science researchers have estimated that, based on the number of unique sites American Internet users visit annually, it would take the average Internet user between 181 to 304 hours to read the relevant privacy policies; this translates to approximately 72 billion hours per year for every U.S. Internet user to read all the privacy policies they encounter. Wunderkind knows, or reasonably should have known, that it is not reasonably possible to read or comprehend the thousands of privacy policies they encounter, including Wunderkind's policies.

100.    As a data broker, Wunderkind takes part in the ongoing, comprehensive surveillance of the Plaintiff and Class members which tramples on their right to privacy and all reasonable expectations of privacy. Everyday Americans, such as Plaintiff and Class members, do not and cannot possess an appropriate level of knowledge about the substantial threats that Wunderkind's surveillance poses to their own autonomy and freedom (in addition to lacking information sufficient to comprehend the nature and extent of Wunderkind's surveillance and its other implications). Further, the infringement on the collective autonomy of Class Members

weakens the social bonds that hold the modern world together, which are grounded in trust and the ability to maintain a private domain outside of the public eye.

101.    A simple Google search or purchase of a good on the Internet does not mean someone has consented to intensive and pervasive surveillance like Wunderkind's. Plaintiff and Class members have not consented to this in any way, shape, or form. To the extent such consent could even be obtained, it would be void and invalid as against public policy given the enormously negative societal implications.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action on behalf of themselves and on behalf of the following proposed Nationwide Class, initially defined as follows:

> All persons in the United States who, within the applicable statute of limitations, have visited a Client's website.

103.    Plaintiff also brings this action on behalf of herself and on behalf of the following proposed California Subclass, initially defined as follows:

> All individuals in California who, within the applicable statute of limitations, have visited a Client's website.

104.    Excluded from the proposed Classes are Defendant and its parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest.

105.    Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

106.    The claims of all class members derive directly from a single course of conduct by the Defendant. Defendant has engaged and continues to engage in

uniform and standardized conduct toward the putative class members. Defendant does not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual class members.

107.    Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

108.    Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other individuals similarly situated pursuant under Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

109.    Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

110.    **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Classes are each so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed each Class includes many tens of thousands of members. The precise number of class members, and their addresses, are unknown to Plaintiff at this time but can be ascertained from Defendant's records.

111.    **Ascertainability.** The Class is ascertainable because its members can be readily identified using business records, and other information kept by Defendant in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

112.    **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

(a) Whether Defendant engaged in the conduct alleged in this Complaint;

(b) Whether Defendant violated the applicable statutes alleged herein;

(c) Whether Plaintiff and the class members are injured and harmed directly by Defendant's conduct;

(d) Whether Plaintiff and the class members are entitled to damages due to Defendant's conduct as alleged in this Complaint, and if so, in what amounts;

(e) Whether Plaintiff and the class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint;

(f) Whether Plaintiff and the Classes are entitled to actual, compensatory, nominal, statutory, enhanced, and/or punitive damages;

(g) Whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

(h) Whether Plaintiff and the Classes are entitled to civil penalties and statutory damages; and

(i) Whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

113. **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)). The claims of Plaintiff and the putative class members are based on the same legal theories and arise from the same unlawful and willful conduct of Defendant, resulting in the same injury to Plaintiff and the putative class members. Plaintiff and all class members are similarly affected by Defendant's wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiff's interests coincide with, and are not antagonistic to, those of the other class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

114. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the class members, and she has retained counsel competent and experienced in complex class action, privacy, and consumer litigation. Plaintiff and her counsel will fairly and adequately protect the interest of the class members.

115. **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and class members. There is no special interest in class members

individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation; the court system could not, given the tens or even hundreds of thousands of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

116. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(1) and (2)). In the alternative, this action may properly be maintained as a class action, because:

(a) the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendant; or

(b) the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c) Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

## FIRST CAUSE OF ACTION

### Unjust Enrichment
### (On Behalf of Plaintiff and All Classes)

117.    Plaintiff, individually and on behalf of the Class, incorporates all preceding paragraphs as if fully set forth herein.

118.    Wunderkind has unjustly retained a financial benefit by systematically collecting, analyzing, and monetizing the personal information of Plaintiff and Class Members without their knowledge, consent, or compensation.

119.    This data, including email addresses, phone numbers, browsing history, device identifiers, IP addresses, and behavioral signals, is the raw material of Wunderkind's commercial engine. Wunderkind packages it, enriches it, and monetizes it through targeted marketing campaigns on behalf of the Clients, reaping significant financial rewards in the process.

120.    Plaintiff and Class Members, by contrast, receive nothing. They are not compensated for the value extracted from their identities. They are not notified that

their actions are being monitored in real time. And they are not provided any meaningful opportunity to withhold their data from being funneled into Wunderkind's tracking infrastructure.

121.    The benefit Wunderkind received was conferred directly by Plaintiff and Class Members, whose devices, online activities, and identities served as the input for Wunderkind's marketing technologies. Plaintiff and Class Members had no reasonable way to detect, resist, or prevent this transfer of value, as Wunderkind's operations are deliberately opaque and hidden from ordinary users.

122.    Under these circumstances, it would be inequitable and unjust for Wunderkind to retain the economic value it derived from its covert surveillance of Plaintiff and Class Members. The enrichment it received came at the expense of their privacy, autonomy, and control over personal data.

123.    Wunderkind's retention of this benefit violates fundamental principles of equity, particularly where, as here, it occurred through deceptive and nonconsensual data harvesting that undermines consumer trust and subverts basic expectations of privacy in digital spaces.

124.    Plaintiff and Class Members do not have an adequate remedy at law.

125.    Plaintiff and Class Members are entitled to restitution in the amount of the benefit unjustly retained by Wunderkind, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion
### (On Behalf of Plaintiff and All Classes)

126.    Plaintiff, individually and on behalf of the Class, incorporates all preceding paragraphs as if fully set forth herein.

127.    Wunderkind intentionally intruded upon the solitude, seclusion, and private affairs of Plaintiff and Class Members by secretly deploying surveillance code on retail websites to intercept and record detailed information about their online behavior.

128.    Wunderkind captured mouse movements, page views, shopping cart contents, email addresses, telephone numbers, IP addresses, browser configurations, and unique behavioral fingerprints, all without ever alerting users that such information was being siphoned and monetized.

129.    The tracking was conducted in real time and designed to identify individuals across sessions and devices. Wunderkind created persistent digital dossiers tied to individual users, tracking them not as anonymous website visitors, but as re-identifiable persons.

130.    No Plaintiff or Class Member gave consent, explicit or implied, to Wunderkind's invasive monitoring. In fact, they were never presented with a disclosure at all. Wunderkind's entire business model depends on operating invisibly, embedding its technology within the infrastructure of websites in a manner that evades user awareness and bypasses meaningful choice.

131.    This secret surveillance would be deeply offensive to a reasonable person. Most Americans do not expect that visiting an online retailer will result in their activity being recorded, linked to their identity, and sold to third parties for profit. The right to browse the internet without being silently profiled and commodified is a core expectation of privacy in the digital age.

132.    Wunderkind's conduct was not just offensive, but extreme. It was calculated to extract maximum behavioral and personal data at the moment of consumer vulnerability: while browsing, while shopping, while entering personal details. Its systems were built to exploit privacy in order to fuel profits.

133.    Wunderkind's intrusion caused injury to Plaintiff and Class Members by violating their reasonable expectations of privacy, appropriating their sensitive information without consent, and exposing them to the downstream risks of commercial profiling and manipulation.

134.    Plaintiff and Class Members do not have an adequate remedy at law.

135.    Plaintiff and Class Members are entitled to compensatory damages for the harm to their dignity, autonomy, and seclusion, as well as punitive damages to deter similar conduct in the future.

### THIRD CAUSE OF ACTION

**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2510, et seq.**
**(On Behalf of Plaintiff and the Nationwide Class)**

136.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the contents of any wire, oral, or electronic communication

through the use of any device, unless one of the parties to the communication has

given prior consent. 18 U.S.C. § 2511(1)(a).

137.    Wunderkind violates the ECPA by deploying hidden code on websites to

capture the contents of visitors' electronic communications in real time, without the

consent of the visitor and without being a party to those communications.

138.    The intercepted communications include full web activity during user

sessions: mouse movements, clicks, scrolls, keystrokes, inputs of email addresses and

phone numbers, product views, cart contents, and other behavior tied directly to the

consumer's intent and identity. These are the contents of communications within the

meaning of the ECPA.

139.    Wunderkind is not a party to these communications. It inserts itself into

private website interactions between users and companies without any disclosure,

visibility, or consent. Its interception is deliberate, systematic, and engineered to

extract value from communications it was never invited to receive.

140.    Furthermore, consent cannot be implied or retroactively manufactured.

No Plaintiff or Class Member received meaningful notice that Wunderkind existed,

let alone that it would actively surveil their interactions with third-party retailers.

As such, Wunderkind's interception occurred without authorization and violated the

core prohibitions of the ECPA.

141.    Wunderkind's conduct was knowing and intentional. It designed and

deployed its tracking scripts specifically to extract the content of consumer

communications in real time and repurpose that data for behavioral targeting and

revenue generation. Its actions were not the result of accident or negligence. They were the business model.

142.    As a result of Wunderkind's illegal interceptions, Plaintiff and Class Members have suffered concrete harms, including the unauthorized disclosure of personal communications, the loss of control over their data, and the invasion of their right to communicate privately with online retailers without surveillance.

143.    Under 18 U.S.C. § 2520, Plaintiff and Class Members seek appropriate relief, including preliminary and other equitable or declaratory relief, statutory damages, punitive damages, and a reasonable attorney's fee and other litigation costs reasonably incurred.

## FOURTH CAUSE OF ACTION

### Violations of New York Gen. Bus. Law § 349
### (On Behalf of Plaintiff and All Classes)

144.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

145.    NY GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

146.    NY GBL § 349 applies to Plaintiff and Class Members because Wunderkind's conduct occurred in New York, where it is headquartered and where key executive and most of its employees are located. Wunkderind's unlawful acts emanate from its New York-based operations, and was directed at consumers across the United States, including residents of New York.

147.    Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to one thousand dollars per violation, if the court finds that the Defendant willfully or knowingly violated this section. The court may award reasonable attorneys' fees to a prevailing plaintiff.

148.    Defendant's conduct was consumer-oriented. Wunderkind's technology is embedded across the websites of hundreds of retail, media, and service brands used by the general public. Its tracking systems affect over a billion consumers engaging in routine, non-sophisticated online activity, including shopping, browsing, and subscribing to marketing communications.

149.    Defendant's practices were materially misleading. A reasonable consumer believes that browsing a website without logging in, submitting identifying information, or accepting cookies preserves some measure of anonymity. Defendant's systems defeat that expectation by continuously collecting behavioral and technical signals, linking them across sessions and devices, and reconstructing persistent, real-world profiles without disclosure.

150.    Defendant also misrepresents the privacy-preserving nature of its identifiers. It describes its tracking system as "pseudonymous" and asserts that data is anonymized or consent-based. In reality, the identifiers remain fully linkable to

actual individuals, and consent, where invoked, was not informed, direct, or specific to Wunderkind's tracking and data sharing.

151. Defendant disseminated these false and misleading statements throughout New York, which were known, or should have been known through reasonable care, to be untrue and misleading to consumers, including Plaintiff and the Nationwide Class.

152. Plaintiff and Class Members have suffered actual harm as a result of Defendant's deceptive practices, including the loss of control over personal and behavioral information; the unauthorized compilation, transfer, and use of that information; and the invasion of their right to be free from covert surveillance and profiling in routine online activity.

153. Plaintiff and the Nationwide Class have no adequate remedy at law.

154. Defendant's conduct has caused and continues to cause immediate and irreparable injury to Plaintiff and the Nationwide Class and will continue to mislead consumers unless enjoined by this Court.

## FIFTH CAUSE OF ACTION

### Invasion Of Privacy Under The California Constitution
### (On Behalf of Plaintiff and the California Subclass)

155. Plaintiff, individually and on behalf of the California Subclass, incorporates all preceding paragraphs as though fully set forth herein.

156. Article I, Section 1 of the California Constitution guarantees every individual the inalienable right to pursue and obtain "privacy." This right is self-

executing and exists independently of statutory protections. It is enforceable against both state and private actors.

157.    Plaintiff and members of the California Subclass had a reasonable expectation of privacy in their communications, behavior, and data shared with websites they visited. They did not expect, nor did they authorize, a third party like Wunderkind to secretly track, record, and harvest that information for its own purposes.

158.    Wunderkind's tracking and data extraction practices, embedded invisibly on websites and activated without user knowledge, constitute a serious invasion of this fundamental right.

159.    The intrusion involved the secret interception of sensitive and granular information: email addresses typed into forms, behavioral cues such as mouse movements and keystrokes, the products consumers browsed or considered, and real-time identification signals derived from their devices and behavior.

160.    Wunderkind's conduct offends societal norms and expectations. Most Californians do not expect to be tracked by an unknown third party when they browse online retailers. Most would be shocked to learn that a shadow entity was not only watching but also actively building a profile of their online behavior without ever revealing itself.

161.    Wunderkind's conduct was not justified by any legitimate business interest. It did not act on behalf of users, nor did it facilitate any functionality the user requested. Instead, Wunderkind exploited its technical position to exfiltrate

private data for its own gain and did so without disclosure, without consent, and without accountability.

162.    As a result of this egregious intrusion, Plaintiff and members of the California Subclass suffered a violation of their constitutional rights, including the loss of control over their personal information, the exposure of their online activities to a third party, and the erosion of trust in their digital environments.

163.    Plaintiff and the California Subclass seek all appropriate relief, including nominal, actual, and punitive damages, as well as injunctive and declaratory relief to stop Wunderkind's unlawful practices.

### SIXTH CAUSE OF ACTION

**Violations of California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631(a)**
**(On Behalf of Plaintiff and the California Subclass)**

164.    Plaintiff, individually and on behalf of the California Subclass, incorporates all preceding paragraphs as though fully set forth herein.

165.    California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631(a), makes it unlawful for any person to "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state."

166.    Wunderkind violated Section 631(a) by intentionally intercepting and extracting the contents of communications between consumers and websites operated by Wunderkind's Clients. These communications included web browsing activity,

mouse movements, email addresses input into forms, purchase intentions, and other behavioral data transmitted via the user's browser in real time.

167.    This interception occurred while the communications were in transit. Wunderkind's code, embedded on Clients' websites, captured this data before it reached its intended recipient. Consumers never knowingly interacted with Wunderkind, never saw its name, and never consented to its involvement in their communications.

168.    Wunderkind was not a party to the communications. It was a third party, surreptitiously inserted into the communication stream. Nor did Wunderkind have authorization to intercept or record these communications.

169.    As a direct and proximate result of Wunderkind's unlawful conduct, Plaintiff and members of the California Subclass have suffered harm, including the invasion of their statutory privacy rights and the loss of control over their personal and behavioral data.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the proposed Classes, pray for relief and judgment against Defendant as follows:

A.    certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative of the Classes, and designating Plaintiff's counsel as Class Counsel;

B.    awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.     awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D.     awarding Plaintiff and the Classes exemplary and punitive damages;

E.     awarding Plaintiff and the Classes civil penalties and statutory damages;

F.     granting Plaintiff and the Classes declaratory and equitable relief, including restitution and disgorgement;

G.     enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

H.     awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I.     awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

J.     awarding pre-judgment and post-judgment interest; and

K.     granting any other relief as this Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 25, 2025

                                                 Respectfully submitted,

                                                 */s/ Raphael Janove*
                                                 Raphael Janove
                                                 **JANOVE PLLC**
                                                 500 7th Ave., 8th Floor
                                                 New York, NY 10018
                                                 Tel: (646) 347-3940
                                                 Email: raphael@janove.law

- 47 -